

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed September 4, 2019**

_____
**United States Bankruptcy Judge**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| JEFFERY MICHEAL HUNT, | § | Case No.:  18-20072-RLJ-7 |
| | § | |
| Debtor. | § | |
| | § | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | § | ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ |
| | § | |
| TRINKETS AND TEA, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adversary No. 18-02006 |
| | § | |
| JEFFERY MICHEAL HUNT, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION

### (Findings of Fact and Conclusions of Law)

On March 13 and 14, 2019, the Court conducted the trial on the amended complaint of

Trinkets and Tea, LLC (Trinkets and Tea) against chapter 7 debtor, Jeffery Micheal Hunt (Hunt).

1

Trinkets and Tea alleges the following: (1) objection to discharge of Trinkets and Tea's claim under § 523(a)(2)(A); (2) objection to discharge of Trinkets and Tea's claim under § 523(a)(2)(B); (3) objection to discharge of Trinkets and Tea's claim under § 523(a)(4); (4) objection to discharge of Trinkets and Tea's claim under § 523(a)(6); (5) objection to Hunt's discharge under § 727(a)(3); (6) objection to Hunt's discharge under § 727(a)(4)(A); and (7) a claim for attorney's fees and costs.[1]

Hunt raises the following defenses: (1) the failure to state a claim upon which relief may be granted under Federal Rule of Civil Procedure 12(b)(6); (2) general denial that Trinkets and Tea sustained damages and that Hunt caused any damages; (3) the exercise of his best judgment under the Business Judgment Rule; and (4) that all claims are barred by res judicata and collateral estoppel.[2]  Hunt submitted the following contested issues of law in the pre-trial order: (1) whether his actions were sufficiently justified to overcome a challenge to his discharge under § 727(a)(3); (2) whether Trinkets and Tea is collaterally estopped from raising its claims; and (3) whether Trinkets and Tea can meet its burden under Federal Rule of Civil Procedure 12(b)(6).[3]

The Court has reviewed and considered the arguments of counsel, the parties' stipulations, the testimony of witnesses, the exhibits admitted into evidence at trial, and the documents and pleadings filed in connection with the adversary.  Based upon the record, the Court now finds and concludes as follows, under Federal Rule of Civil Procedure 52, made applicable in the adversary by Federal Rule of Bankruptcy Procedure 7052.

---

[1] Doc. No. 5.  All "Doc. No." references herein are to the current adversary proceeding, Adversary No. 18-02006, unless otherwise stated.  All "§" references herein are to Title 11 of the United States Code, unless otherwise stated.
[2] Doc. No. 9.
[3] Doc. No. 17.

# I.  **Findings of Fact**

## Heise and Hunt Discuss Prospects of Tea 2 Go

1.  Brooks Heise first met Jeff Hunt in the Fall of 2014.  At the time, Hunt was involved in owning, operating, and potentially franchising retail tea stores under the name Tea 2 Go that sold tea and tea-based products to walk-in customers.  He was then operating a Tea 2 Go store that he referred to as the "Glenna store" given its location on Glenna Goodacre street in Lubbock, Texas.  Heise was employed as a medical-supplies salesman but was interested in eventually running his own business.  He was particularly interested in the Tea 2 Go concept.

2.  Heise and Hunt discussed the possibility of Heise buying a franchised Tea 2 Go store. But Heise expressed to Hunt early-on that he had no experience or training in operating a franchise and thus was more interested in first investing in one or more of the tea stores rather than owning and operating one.

3.  In his conversations with Hunt about a potential investment, Hunt told Heise that the Glenna store and other Tea 2 Go stores were profitable, as was Hunt's tanning-salon business. Heise believed these representations and testified that he relied on them in making his investment.

4.  Hunt, according to Heise, told him that the Glenna store was making $3,000–$10,000 per month.  Hunt also mentioned a new Tea 2 Go store that he was looking to open on Milwaukee Avenue in west Lubbock, which he referred to as the "Hub store."  Hunt promoted the Hub store as a potentially more profitable store.  It would be nicer and with more conveniences for customers than the other Tea 2 Go stores.

5.  While considering a possible investment, Heise received from Hunt a one-page statement of income and expenses for the Glenna store.  Heise also visited the store.  He was impressed.  It appeared to be well-run, and he liked the concept.

6.  In November 2014, Hunt had Tom Knapp, the attorney for Tea 2 Go, send an information packet to Heise for a Tea 2 Go franchise.  Pl.'s Ex. 14.  This consisted of promotional information for prospective franchisees; it touted the benefits of tea as part of a healthy lifestyle and how a Tea 2 Go franchise offered a great opportunity to exploit the benefits of tea.  It also contained some financial information—the franchise fee of $50,000, the estimated cost of building-out a store (about $230,000), and a basic profit and loss (P&L) statement for "one of our stores from April 1, 2014 through June 23, 2014." *Id*.  The P&L statement reflected revenues of $160,829 and expenses of $76,000, with an after-tax profit of over $70,000.  It compared Tea 2 Go with a competitor, Teavana.  *Id*.

7.  After reviewing this information, Heise thought the potential income from a Tea 2 Go store would be sufficient to allow him to repay a loan that he intended to obtain for the investment.

8.  On November 25, 2014, Hunt emailed to Heise a recent P&L statement for the Glenna store.  Pl.'s Ex. 15.  The P&L reflected revenues and operating expenses for April 2014 through October 2014.  The net profits for each month were as follows: April - $24,365.90; May - $13,143.46; June - $6,529.74; July - $4,992.35; August - $9,351.25; September - $6,426.84; October - $8,401.91.  *Id*.  The stated monthly rental expense was $3,337.00.  *Id*.  Heise considered this information in making his decision to invest with Hunt.

<u>Heise's Investment and the Glenna and Hub Partnerships</u>

9. On February 12, 2015, Heise invested a total of $90,000 in the two stores, $50,000 for the Hub store and $40,000 for the Glenna store. He made the investment through a limited liability company that he formed, Trinkets and Tea, LLC. For this, he—or rather Trinkets and Tea—received a 10% partnership interest in the Hub store and a 49% partnership interest in the Glenna store. The other partner for both stores, and the entity to which the $90,000 payment was made, was Tea 2 Go, LLC, which was owned by Jeff Hunt. The two partnerships were HUB Tea2Go and Glenna Goodacre Tea2Go, respectively. Tea 2 Go, LLC held the other 90% of the Hub store and the 51% of the Glenna store.

10. To formalize the investment, partnership agreements were prepared by Hunt's lawyer and signed by Hunt and Heise for the named partners of the partnerships. Pl.'s Exs. 1, 2. The stated effective date for both is February 1, 2014, but the parties said the 2014 date is a mistake and should be 2015.

11. Heise obtained the funds for the investment from a bank loan that he personally guaranteed.

12. Hunt was the designated manager of each of the two partnerships. Pl.'s Exs. 1 ¶ 7.2, 2 ¶ 7.2. Heise understood that Hunt had the necessary expertise—and indeed a "system"—to successfully run the two stores.

13. Each partnership agreement provides that the partnership "shall keep complete and accurate records of Partnership transactions. All records of the Partnership will be maintained at the principal office. Any Partner shall have the right at any time to inspect and copy the records of the Partnership." Pl.'s Ex. 1 ¶ 1.5.[4]

---

[4] Because the partnership agreements contain identical language, referencing a paragraph in one is the same as referencing the same paragraph in the other.

14. Each partnership agreement grants to the partners the "right, power and authority on behalf" of the partnership to receive and hold partnership property in the name of the partnership, to open bank accounts in the name of the partnership, to collect sums due to the partnership, and to pay the debts of the partnership. *Id*. ¶ 7.3(a).

15. Each agreement further provides as follows:

> The Partners shall act in good faith in the performance of the Partners' obligations … but shall have no liability or obligation to any other Partner or the Partnership for any decision made or action taken in connection with the discharge of the Partners' duties hereunder if such decision or action is made or taken in good faith and in the exercise of due care in connection with the Partnership business.

*Id*. ¶ 7.3(c).

16. Under section 7.6, each partner indemnifies the other for any claims or liabilities arising out of or incidental to the management of the partnership affairs. *Id*. ¶ 7.6. Excepted from the indemnification, however, is a claim resulting from a partner's gross negligence, misconduct, fraud, bad faith, or breach of the agreement. *Id*.

17. As manager, Hunt handled the day-to-day operations of the partnerships. He managed the staff, paid the bills and payroll, and deposited the receipts. He did *not* set-up separate bank accounts for the two partnerships (either the Hub store or the Glenna store). *See infra* Finding 31.

18. No evidence was provided of how the invested funds, the $90,000, were to be used.

Post Investment

19. After he made his $90,000 investment, Heise received a P&L statement for the Glenna store that reflected rent for January 2015 of $3,450. Heise suspected this was too low and asked Hunt about it. Heise did not hear back from Hunt for at least two months.

20. Heise followed up on the issue of the rent by an email he sent to Hunt and Tom Knapp on April 27, 2015, in which he references the "January Glenna P&L" and points out a "tab that states rent as late as Jan 15 as $3450." Pl.'s Ex. 16. Knapp responded the next day, April 28, acknowledged the mistake, and apologized. He said it looked like the rental amount was "mistakenly transposed." *Id*. According to an April 2015 P&L, the monthly rental was $5,129.29. Pl.'s Ex. 17. Heise's email belies that he was upset with the mistake. He noted that "[w]ith almost 15k in revenue in all the P&Ls listed in the attached we would have been profitable." *Id*. The tenor of the inquiry is cordial. It is *not* credible that Heise would not have proceeded with the investment had he been apprised of the correct monthly rental for the Glenna store before he made the investment.

21. Heise testified that after he made the investment, he requested that separate bank accounts be set-up for the partnerships. But this request was mostly ignored, he said. He was told that he would need to put-up the funds for any new accounts.

22. During the months of February, March, and April of 2015, Heise occasionally visited the Glenna store. It generally appeared that the store was doing well. He also made inquiries about reviewing its business records, but he said he never received any meaningful information about the store's financials.

23. The Hub store opened in May 2015. Heise attended the grand opening. He said the store looked good, though he was never given or provided access to any records detailing the partnerships' acquisition of property needed for the store.

24. Through the summer and fall of 2015, both the Glenna store and the Hub store appeared to Heise to be operating as he expected. He was not, however, privy to the stores' financials showing whether they were profitable or not.

25. The Glenna store was forced to close due to past-due rents for the months of November 2015 and December 2015.  Pl.'s Exs. 18, 29.  The landlord, Centre Lubbock TX, LLC, locked the doors and seized the assets.

26. Hunt did not tell Heise that the Glenna store defaulted in paying its rent.  When confronted by Heise, Hunt simply told him that there was a misunderstanding with the landlord. Heise was ultimately told that the Glenna store owed about $20,000 for past-due rent and other items.  Heise was shocked by this development and knew then that his investment was in jeopardy.

27. The Glenna store never reopened.  Its assets were seized and sold by the landlord at auction.  In addition, the Hub store was sold.  Heise believes he has lost his entire investment, though he (through Trinkets and Tea) still retains a 10% interest in the Hub store.

28. Hunt ran the businesses, at least in part, through the Happy State Bank account of his company Tea 2 Go, LLC, the controlling general partner for both partnerships.  From this account, Hunt made numerous payments and distributions on items not related to either of the two stores.  For example, payments were made on loans, though the partnerships had no loans (loan payments were made on loans of Tea 2 Go, LLC); distributions were made to Jeff Hunt; payment was made for rent to "The Residences"; and a $13,500 online transfer was made to "Amazing Tans LLC," another one of Hunt's businesses.  Pl.'s Ex. 4.

29. The credit card receipts from the stores were deposited into an account of T4U, LLC, yet another one of Hunt's entities.  Pl.'s Exs. 20–22.  This included receipts for December 2015, when the rent went unpaid on the Glenna store.

30. Though Heise and Hunt talked about having a joint bank account for the two partnerships, no such account was set-up for the partnerships.  Separate accounts—or separate

accounting records generally—were not kept for each of the two stores. Some basic P&L statements were provided.

31. Hunt never opened a separate bank account for either the Glenna store or the Hub store. Instead, all funds from the two stores were deposited into either T4U, LLC's account at Platinum Bank or Tea 2 Go, LLC's account at Happy State Bank.

32. Heise (or Trinkets and Tea) received only one distribution for his interest in the Glenna store. The distribution was issued in May 2015 for $1,201.08 and was based on the April P&L statement. Pl.'s Ex. 17. Hunt testified that this distribution was made because of the mistake on the rent for the Glenna store. Heise never received a distribution for the Hub store.

33. Apart from simple P&L statements, Heise is not aware of any records having been maintained for each of the partnerships. He is not aware of any records reflecting the partnerships' acquisition or ownership of partnership property—equipment, furniture, fixtures, inventory, etc.

34. Hunt did not dispute Heise's understanding that separate records were not maintained for each of the partnerships.

<u>Heise's and Hunt's Testimony</u>

35. Heise testified that he was to have full access to the books and records for the two stores and that he requested access to the books and records many times. He said such access did not occur in the normal course.

36. Heise said that by making this investment he was looking to learn how to operate his own business. He had never owned and operated his own business. He said he understood Hunt to have been successful in operating franchises and other small businesses and that he thought he would learn from working with Hunt.

37. He testified that he is not aware of any property acquired by the partnerships. Despite this, he visited the two stores many times and was thus aware of the equipment, inventory, furniture, and fixtures present in the two stores.

38. Heise testified that he was never provided any records showing the inventory of the stores, their accounts receivable, invoices, or receipts. He said that when he requested information from Hunt, Hunt told him to contact "Nicole" who sent to him, at most, some receipts for one month that were unavailing.

39. Heise said that after he made the investment, he repeatedly asked Hunt, Taylor Logan (the V.P. of Tea 2 Go, LLC), and Tom Knapp for books and records. He said that he was told prior to the investment that certain financial and operational information was proprietary and thus not available.

40. Heise testified that funds from the partnerships were "commingled." This was no doubt the case for the two partnerships. It is unclear if funds from the two partnerships were commingled with funds from other entities owned by Hunt, however.

41. Heise testified that had he known the correct monthly rent for the Glenna store, it would have made a difference in his decision to invest.

42. Hunt's conduct towards Heise was indifferent and cavalier, and his testimony lacked candor. He said the Glenna store and the Hub store failed because "traffic went down" and "expenses exceeded revenues." He said that it never "crossed his mind" to open-up separate bank accounts for the two partnerships. Hunt never called a meeting of either partnership and did not inform Heise of the Glenna store's rent default.

43. Hunt explained that a $100,000 loan was obtained from Platinum Bank for construction on the Hub store. He also said that he owed Happy State Bank approximately $1,000,000 on Tea

2 Go loans. He said the transfer of funds out of the Happy State Bank account for Amazing Tans was done by the bank and without his approval. The Court surmises that the bank offset the funds.

The State Court Suit

44. Prior to Hunt's bankruptcy filing, in May 2016, Trinkets and Tea sued Tea 2 Go, Hunt, and a third party, Taylor Logan, in state district court in Lubbock. Pl.'s Ex. 23. Trinkets and Tea sued for inspection of books and records, breach of contract, money had and received, conversion, breach of fiduciary duties, and common-law fraud. *Id*. Before trial, an involuntary petition in bankruptcy was filed against Tea 2 Go, which stayed the action against Tea 2 Go.[5] On Trinkets and Tea's motion to sever, all actions and parties, save for the breach-of-fiduciary-duties claim against Hunt, were severed out and made a separate action. Pl.'s Ex. 25.

45. Trial proceeded against Hunt personally and resulted in a take-nothing judgment on Trinkets and Tea's breach-of-fiduciary-duties claim. Pl.'s Ex. 26. The court found that Trinkets and Tea made a $90,000 investment to Hunt as managing member of the Glenna and Hub partnerships and that Hunt owed fiduciary duties to Trinkets and Tea. Pl.'s Ex. 27. The court found that from an account that contained the $90,000, payments or transfers were made to non-partner LLCs, for personal obligations of Hunt, and to Hunt's personal bank account. *Id*. Despite this, the court found "no proof that issuance of these payments violated the fiduciary duties owed by Hunt to the [p]artnerships." *Id*. "Because there was no other evidence other than the fact that the payments were made, it was just as likely as unlikely that the payments were proper partnership expenses." *Id*. The court found that there was no accounting produced of the accounts in question, that no lost profits were shown, and that there was no evidence of a causal

---

[5] Case No. 17-20059, Doc. No. 1 (filed Jan. 20, 2017).

connection between the alleged improper payments and the loss of the $90,000 claimed as damages by Trinkets and Tea. *Id.* The court thus concluded that Trinkets and Tea failed to prove that Hunt breached a fiduciary duty to Trinkets and Tea or that the complained-of actions caused the damages that Trinkets and Tea sought. *Id.*

## II. <u>Conclusions of Law</u>

### A.

### <u>Jurisdiction and Venue</u>

1. The Court has jurisdiction of this action under 28 U.S.C. §§ 1334(b) and 157(a) and by the District Court's Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc, adopted in this district on August 3, 1984. The claims before the Court are core claims under 28 U.S.C. § 157(b)(2)(A), (B), (I), and (J). The parties have consented to the Court deciding all pending claims. The Court has authority to enter a final judgment in this adversary proceeding. 28 U.S.C. § 157(b)(1), (c)(2); *see Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1948–49 (2015).

2. Venue is proper under 28 U.S.C. § 1409.

### B.

### <u>Claims of the Parties</u>

3. Trinkets and Tea objects to Hunt receiving the general discharge of all debts of his bankruptcy case or, alternatively, the discharge of the specific debt that Hunt allegedly owes to Trinkets and Tea.[6] The general discharge objection is brought under § 727(a)(3) and (a)(4)(A) of the Bankruptcy Code; the alternative cause, commonly referred to as a dischargeability claim, is brought under § 523(a)(2)(A), (a)(2)(B), (a)(4) and (a)(6) of the Code.

---

[6] Doc. No. 5.

4.  Under § 727(a)(3), an *individual* debtor may be denied the discharge for his concealing, destroying, falsifying, or failing to keep records of his financial condition or business transactions.  Subsection (a)(4)(A) provides that such debtor may be denied the discharge if the debtor has, in connection with his case, made a false oath or account.

5.  Under § 523(a)(2)(A), a particular debt is not discharged if it arises from the debtor's false or fraudulent representation or statement that does *not* concern the debtor's financial condition.  Subsection (a)(2)(B), on the other hand, requires a *written* representation that *does* concern the debtor's financial condition, which was relied upon, and was made by the debtor with intent to deceive.  The other two dischargeability claims address debts that, for subsection (a)(4), arise from the debtor's fraud or defalcation, embezzlement, or larceny; or, for (a)(6), arise from the debtor's willful and malicious injury to the claimant or the claimant's property.

6.  Hunt denies all claims and specifically contends that Trinkets and Tea's claims are barred by res judicata or collateral estoppel.

7.  Before addressing the claims under §§ 523 and 727, the Court first considers Hunt's estoppel defense and then the issue of Hunt's personal liability to Trinkets and Tea that is raised by Hunt serving as the single member of the limited liability company (LLC) that was the controlling general partner of the two general partnerships.

## C.

### Collateral Estoppel

8.  Despite some hesitancy to definitively say that collateral estoppel applies in dischargeability proceedings, the Supreme Court eventually clarified that it does indeed apply and thus can bar relitigation of issues already decided in a prior proceeding.  *Grogan v. Garner*, 498 U.S. 279, 284 n.11 (1991) ("Our prior cases have suggested, but have not formally held, that

the principles of collateral estoppel apply in bankruptcy proceedings . . . . We now clarify that collateral estoppel principles do indeed apply in discharge exception proceedings pursuant to § 523(a).") (internal citations omitted). In fact, in *Grogan*, although deciding the issue of what standard of proof applies to dischargeability actions, the Supreme Court noted that a prior adjudication of fraud allows "a bankruptcy court [to] properly give collateral estoppel effect to those elements of the claim that are identical to the elements required for discharge and which were actually litigated and determined in the prior action." *Id.* at 284.

With this in mind, the analysis here parallels that of *Tomlinson v. Clem (In re Clem)*, 583 B.R. 329 (Bankr. N.D. Tex. 2017). In *Tomlinson*, the "Plaintiffs-Creditors [,the Tomlinsons,] objected to the dischargeability of a debt owed to them by the Defendant-Chapter 7 Debtor, [Clem], pursuant to section 523(a)(2)(A) of the Bankruptcy Code." *Id.* at 334. The Tomlinsons contracted with Bella Vita Custom Homes, LLC (Bella Vita), a Texas entity in which Clem owned an approximate 50% share, to build a custom home in the Dallas area. *Id.* at 335. After executing the contract, to say things went awry would be an understatement; the $4,483,185.72 project proved too much for Clem and Bella Vita and ultimately led to a $744,711 arbitration award in favor of the Tomlinsons against both Clem and Bella Vita, jointly and severally. *Id.* at 335–36. Shortly after the arbitration award was adopted into a judgment by the state court, Clem filed for bankruptcy. *Id.* at 336–37.

The Tomlinsons thereafter filed an adversary proceeding against Clem arguing that the judgment was not dischargeable under § 523(a)(2)(A). *Id.* at 337–38. Clem attacked the Tomlinsons' allegations by arguing that res judicata barred argument over the § 523(a)(2)(A) claims and issues "because fraud was asserted in the Prepetition Arbitration by the Plaintiffs-Creditors and such claims were denied in the Arbitration Award." *Id.* at 338. The court

14

disagreed with Clem's defense, writing that res judicata is not an available defense in

dischargeability proceedings, but then considered the more complicated issue of applying

collateral estoppel. *Id.* at 339–40 (citing *Brown v. Felsen*, 442 U.S. 127, 133–39 & n.10 (1979)

("[T]he bankruptcy court is not confined to a review of the judgment and record in the prior

state-court proceedings when considering the dischargeability of respondent's debt." Although,

"[i]f, in the course of adjudicating a state-law question, a state court should determine factual

issues using standards identical to those of [predecessor to § 523], then collateral estoppel, in the

absence of countervailing statutory policy, would bar relitigation of those issues in the

bankruptcy court.")).

     To start, the court outlined the factors for establishing collateral estoppel under both

Texas and Fifth Circuit law:

> Under Texas law, a party seeking to invoke the doctrine of collateral estoppel must
> establish: (1) the facts sought to be litigated in the second action were fully and
> fairly litigated in the prior action, (2) those facts were essential to the judgment in
> the first action, and (3) the parties were cast as adversaries in the first action. This
> is similar to the Fifth Circuit's requirements for application of collateral estoppel,
> which are: (1) that the issue under consideration is identical to the issue previously
> litigated, (2) that the issue was fully and vigorously litigated in the primary
> proceeding, (3) that the previous determination of the issue was necessary for the
> judgment in that proceeding, and (4) that no special circumstances exist that would
> render preclusion inappropriate or unfair.

*Id.* at 340–41 (citing *Pancake v. Reliance Ins. (In re Pancake)*, 106 F.3d 1242, 1244 (5th Cir.

1997); *Universal Am. Barge Corp. v. J-Chem, Inc.*, 946 F.2d 1131, 1136 (5th Cir. 1991)). Then,

to elaborate, the court construed the Fifth Circuit's opinion in *Dennis v. Dennis (In re Dennis)*,

25 F.3d 274 (5th Cir. 1994). *Id.* at 341–42.

     In *Dennis*, the objecting creditor, the debtor's ex-wife, sought to except from discharge a

debt owing under a pre-petition divorce decree. *Dennis*, 25 F.3d at 275. The terms of the

divorce decree were memorialized in a settlement agreement with the following language,

"[T]his Judgment is part of the division of community property between the parties and shall not constitute or be interpreted to be any form of spousal support, alimony, or child support." *Id.* at 276. The debtor thus argued that this language precluded his ex-wife from claiming nondischargeability under § 523(a)(5) because the debt was neither alimony, maintenance, nor support. *Id.* at 277. As noted in *Clem*, the bankruptcy court and the Fifth Circuit disagreed with the debtor's collateral estoppel argument. *Clem*, 583 B.R. at 341–42. In reaching this conclusion, the Fifth Circuit opined that state court judgments, and their attendant labels, are not reached with federal bankruptcy law in mind, and a state court's review of a similar issue to that raised in the bankruptcy is likely different from the review conducted by the bankruptcy court. *Dennis*, 25 F.3d at 277–78. The Fifth Circuit further stated:

> Hence, in only limited circumstances may bankruptcy courts defer to the doctrine of collateral estoppel and thereby ignore Congress' mandate to provide plenary review of dischargeability issues. Collateral estoppel applies in bankruptcy courts only if, *inter alia*, the first court has made *specific, subordinate, factual findings on the identical dischargeability issue* in question—that is, an issue which encompasses the same *prima facie* elements as the bankruptcy issue—and the facts supporting the court's findings are discernible from that court's record.

*Id.* at 278 (emphasis added). The Fifth Circuit reiterated this point in *Fielder v. King (In re King)*, 103 F.3d 17 (5th Cir. 1997).

In *King*, the Fifth Circuit first set out to explain that the party asserting collateral estoppel bears the burden of proof "and hence would have the burden of bringing forward an adequate state-court record." *Id.* at 19.[7] The facts in *King* are summarized as follows: the Fielders obtained a state court judgment against the debtor, King, for breach of contract and fraud; the judgment was, however, amended to limit the Fielders' recovery to the breach of contract claim

---

[7] Noting, however, that "[a] full state-court record will not always or even often be required for the bankruptcy court to apply issue preclusion." *King*, 103 F.3d at 19 n.1 (citing *Sheerin v. Davis (In re Davis)*, 3 F.3d 113, 114–15 (5th Cir. 1993)).

only and did not specify a reason for eliminating the damages related to fraud; King filed for bankruptcy, and the Fielders sought to except from King's discharge the debt owing under the amended judgment. *Id.* at 18–19. The Fielders argued that § 523(a)(2)(A) rendered the debt nondischargeable, but the bankruptcy court, later affirmed by the district court, ruled that the Fielders' argument was barred by res judicata. *Id.* The Fifth Circuit reversed, first commenting that "res judicata does not apply in bankruptcy nondischargeability proceedings[,]" and further that "the state-court record does not contain *a specific, subordinate factual finding* that King's debt was *not* obtained by false pretenses, a false representation, or actual fraud nor does it contain any facts that would support such a finding." *Id.* at 19–20 (emphasis in original and added). In fact, the Fifth Circuit observed in a footnote that "[t]he Fielders need not have recovered a state-law fraud verdict in order to prevail on a claim that the debt owed them was obtained by fraudulent behavior and consequently should not be discharged." *Id.* at 19 n.3 (citing *Brown*, 442 U.S. at 138–39).

The Court may review the facts and issues raised in a dischargeability proceeding regardless of a previous adjudication by a state court of similar or related claims. And it should give preclusive effect to only those issues that are identical to the dischargeability issues and for which the prior court made specific, subordinate factual findings. Hunt obtained a Final Take Nothing Judgment in the 99th Judicial District Court of Lubbock County, Texas.[8] The Judgment, however, relates only to Hunt's alleged breach of fiduciary duties, more specifically the duties of loyalty and care. (All other claims alleged by Trinkets and Tea in the state court petition were severed out and are still pending.)[9] Here, Hunt admitted a full transcript of the

---

[8] Pl.'s Ex. 26.
[9] *See* Pl.'s Ex. 25.

state-court proceeding.[10]  Considering the Court's "broad discretion" to apply collateral estoppel to the state-court judgment obtained by Hunt, the Court concludes that it will not.  *See Clem*, 583 B.R. at 344.

First, the judgment is conclusory.  It lacks specific, subordinate factual findings that the $90,000 was or was not obtained by "false pretenses, a false representation, or actual fraud," or by use "of a statement in writing that is materially false; respecting the debtor's . . . financial condition; on which the creditor . . . reasonably relied; and that the debtor caused to be made or published with intent to deceive."  § 523(a)(2)(A), (B).  The judgment likewise does not address whether Hunt engaged in "fraud or defalcation while acting in a fiduciary capacity," embezzled funds, or committed larceny; nor does it address whether Hunt caused a "willful and malicious injury."  § 523(a)(4), (6).  And it contains no findings that Hunt concealed or failed to keep records of his business; nor does it make findings that he did or did not "knowingly and fraudulently, in or in connection with the case[,] [make] a false oath or account."  § 727(a)(3), (4)(A).  (The Court recognizes the impossibility of the latter § 727-findings by the state court because Hunt's bankruptcy had not yet been filed.)

Second, although the state court applied a preponderance of the evidence standard in its conclusions of law—the same standard that applies to the claims here—it would be unfair to apply collateral estoppel to Trinkets and Tea's claims where the state court record does not allow the Court to conclude that dischargeability issues were "fully and fairly litigated."  *See Clem*, 583 B.R. at 345–46.  Though the state court issued its take-nothing judgment against Trinkets and Tea, there is no evidence in the state court record that Trinkets and Tea "fully and vigorously litigated" claims other than those for breach of fiduciary duties.  *See id*.  Trinkets and Tea could

---

[10] Def.'s Ex. C.

not litigate the claims and issues presently before this Court because it was not, at the time, facing the particular discharge and dischargeability issues that arose as a result of Hunt's bankruptcy. *See id.* (citing *Brown*, 442 U.S. at 133–39).

9. The Court will not give collateral estoppel effect to the state court judgment.

## D.

### Hunt's Personal Liability

10. Hunt is the single member of a Texas entity, Tea 2 Go, LLC. Two general partnerships were created between Tea 2 Go, LLC and Trinkets and Tea: HUB Tea2Go and Glenna Goodacre Tea2Go.[11] Each partnership agreement named Hunt the initial manager, a designation that was never revoked.[12] Aside from the partnership name, the agreements are identical. Brooks Heise is the single member of Trinkets and Tea, also a Texas entity, and was present and testified at the hearing before the Court. As described, the general partnerships are each "two-tier" entities in which the individuals are protected from liability at two levels. Unraveling these entities is complicated but not impossible. At least two courts have considered liability against an individual under similar facts as those before the Court.[13]

The first step, here, is to understand each partner's liability within the general partnerships. "A partner is liable to a partnership and the other partners for: (1) a breach of the partnership agreement; or (2) a violation of a duty to the partnership or other partners . . . that causes harm to the partnership or the other partners." Tex. Bus. Orgs. Code § 152.210. Texas law imposes a duty of loyalty and duty of care in every general partnership. *See id.* §§ 152.204, .205, .206. Similarly, partners must exercise good faith and act in the best interests of the

---

[11] Pl.'s Exs. 1, 2.
[12] Pl.'s Exs. 1 ¶ 7.2, 2 ¶ 7.2.
[13] *See FNFS, Ltd. v. Harwood (In re Harwood)*, 404 B.R. 366 (Bankr. E.D. Tex. 2009); *Tomlinson v. Clem (In re Clem)*, 583 B.R. 329 (Bankr. N.D. Tex. 2017).

partnership when conducting partnership business.  *See id.* § 152.204(b).  A partner does not, however, violate a duty or obligation under the Texas Business Organizations Code (TBOC) or the partnership agreement "merely because" the partner's actions further the partner's own interests.  *Id.* § 152.204(c).

The duty of loyalty requires, among other things, that the partner account to and hold partnership property and that the partner refrain from taking actions adverse to the partnership.  *See id.* § 152.205; *see also FNFS, Ltd. v. Harwood (In re Harwood)*, 637 F.3d 615, 625–26 (5th Cir. 2011) (a partner must act solely for the benefit of the partnership); *cf. Moreno v. Ashworth (In re Moreno)*, 892 F.2d 417, 421 (5th Cir. 1990) (an officer's duty "encompasse[s], at least, a responsibility not to lend [the corporation's] money to himself or corporations controlled by him on less than an arms-length basis").  The duty of care is measured by consideration of what an ordinarily prudent person would do under similar circumstances.  TEX. BUS. ORGS. CODE § 152.206(a).  It requires a partner to act on an informed basis, in compliance with the partner's duties to the partnership, in good faith, and in the partnership's best interest.  *Id.* § 152.206(c) (referring to § 152.204(b)).

Regarding standing, individual partners may maintain actions against other partners "for legal or equitable relief" to enforce their rights under the partnership agreement or for breach of the duties of loyalty and care.  *Id.* § 152.211(b); *see also Art Midwest Inc. v. Atl. Ltd. P'Ship XII*, 742 F.3d 206, 217 (5th Cir. 2014) (applying Texas law and noting that "a partner may individually sue for the benefit of the partnership and other partners." (internal quotation and citation omitted)).  Thus, Trinkets and Tea's action on behalf of the partnerships, and itself as the only other partner, is allowed.

But here, the action is maintained against Hunt individually, not Tea 2 Go, LLC. The Court, then, must first determine if Tea 2 Go, LLC breached its duties to the partnership. In turn, that leads the Court to step two: Where the other partner, in a two-partner general partnership, is an entity, may the Court impose any personal liability against the sole manager of the partner-LLC?

In *FNFS, Ltd. v. Harwood (In re Harwood)*, 404 B.R. 366 (Bankr. E.D. Tex. 2009), *aff'd*, 637 F.3d 615 (5th Cir. 2011), the court broke down the debtor's personal liability as the former president and chief operating officer of a corporation that served as the general partner to a limited partnership. In that case, the objecting creditor, FNFS, Ltd. (FNFS), sought to deny the debtor, Harwood, of his discharge under § 727(a)(2)(A) or (B), or, in the alternative, sought to except from discharge a debt owing to FNFS under § 523(a)(2)(A), (B), (a)(4), or (a)(6). *Id.* at 377. As relevant background, Harwood owned a 50% share of and was designated the president and chief operating officer of B&W Finance Co., Inc. (B&W). *Id.* at 377–78. B&W was engaged in the business of making small consumer loans, and in connection with that business, FNFS was created, in which B&W owned a 51% interest and served as the sole general partner. *Id.* In his capacity as president and COO of B&W,

> Harwood exercised virtually all executive power over FNFS operations on a daily basis. . . . He planned and supervised the growth and expansion of the FNFS lending locations. He controlled the hiring, evaluation, promotion, and termination of FNFS employees . . . . No one with daily involvement in the company's affairs could challenge Harwood's authority or decision-making. He managed all FNFS operations from the central office in Tyler. He also managed to access substantial amounts of money from FNFS for his own individual use.

*Id.* at 378. Over several years, Harwood funneled large amounts of partnership funds to himself—granting liens in favor of the partnership that were never recorded and that were kept in a drawer in Harwood's desk, secured reimbursements for business expenses without supporting

documentation, and placed his wife on B&W's payroll, "although she admittedly performed no tangible service for the company." *Id.* at 378–79. The court observed that Harwood "offered only limited efforts to differentiate between personal and business expenses." *Id.* at 380. B&W and FNFS sued Harwood in state court seeking to collect the funds misused. *Id.* at 382. In response to this lawsuit, Harwood filed for bankruptcy. *Id.* In the bankruptcy, some of Harwood's assets were sold and FNFS received the proceeds in partial satisfaction of Harwood's debt. *Id.* at 382–83. Because there remained an outstanding indebtedness, FNFS brought its dischargeability complaint.

For reasons other than the issue of Harwood's personal liability, the court denied FNFS's dischargeability claims under § 523(a)(2)(A), (B), and (a)(6). *Id.* at 383–92. After first considering whether Harwood owed a fiduciary duty to FNFS, the court did except from Harwood's discharge a portion of the debt owing to FNFS under § 523(a)(4). *Id.* at 394–99, 406–07.

Harwood's contention was that he owed fiduciary duties to B&W but did not owe fiduciary duties to the limited partnership, despite his control of the corporation which served as its general partner. *Id.* at 394. FNFS did not seek to determine B&W's liability to the partnership. With this context, the court made the following note,

> . . . B&W undoubtedly failed in its duty to FNFS by failing to control the actions of its own officers. However, without any party seeking a formal finding that B&W itself committed a tort against FNFS, such an omission precludes any assessment of liability against Harwood under the Texas line of authority that a corporate officer's knowing participation in a tortious act of the corporation subjects him to personal liability to third parties without the necessity of piercing the corporate veil.

*Id.* at 394 n.54 (citing *Fistek v. Kelley*, 114 F.3d 1183 (5th Cir. 1997); *Commercial Escrow Co. v. Rockport Rebel, Inc.*, 778 S.W.2d 532, 541 (Tex. App.—Corpus Christi 1989, writ denied); *Grierson v. Parker Energy Partners*, 737 S.W.2d 375, 377–78 (Tex. App.—Houston [14th Dist.]

1987, no writ)).  The court went on to discuss, however, that the use of "multi-tiered organizational structures" has caused a shift in assessing individual liability when the offending actions are carried out, for example, by "an individual serving as the sole officer of a corporate general partner of a limited partnership."  *Id.* at 394–95.

This turned the court's analysis to the Fifth Circuit's decision in *LSP Investment Partnership v. Bennett (In re Bennett)*, 989 F.2d 779 (5th Cir. 1993).  In *Bennett*, the Fifth Circuit's reliance on "the nature of the business relationship as a whole, in which one person . . . exercised almost total control over the project[,]" allowed that court to conclude that the debtor, Bennett, who was the sole general partner of a limited partnership that acted as the general partner to the affected limited partnership, owed a fiduciary duty to the limited partners sufficient to meet the requirements of § 523(a)(4).  *Id.* at 781, 788–89.  Thus, where an individual substantially controls the actions of the named partner in a two-tier partnership arrangement, that individual could have a fiduciary duty to the partnership.  *See Harwood*, 404 B.R. at 395–96.

Then assessing Harwood's contention that the foregoing analysis in *Bennett* was inapplicable because he was a single officer of a corporation, the court adopted a substance-over-form perspective.  *Id.* at 396–97 (discussing *Park v. Moorad (In re Moorad)*, 132 B.R. 58, 62–63 (Bankr. N.D. Okla. 1991), wherein that court wrote, "The Court, however, will not allow the Debtor to hide beneath a corporate shell when he so completely controlled the corporate actions, representations and decisions that in effect it had no life without him.").  Of consequence is the "degree of control actually exercised by a corporate officer over the actions of a corporate general partner."  *Id.* at 397.  Harwood, therefore, as an individual, owed fiduciary duties to FNFS and breached those duties by his actions, rendering portions of FNFS's claim nondischargeable.  *Id.* at 397–99.

Again looking to *Clem*, that court also decided whether to impose personal liability against a member of an LLC, when it was the LLC that signed the contract with the objecting creditors. *Clem*, 583 B.R. at 368–72. In doing so, the court considered whether it was necessary to pierce the corporate veil thereby creating a "debt" for which the debtor was personally liable. *Id.* at 368–69. Relying on §§ 21.223, 101.002, and 101.114 of the TBOC, the court's analysis first acknowledged that managers/members of LLCs are not individually liable for the contractual debts and obligations of the LLC, unless there is a finding that the contractual debt or obligation was incurred by actual fraud for the direct personal benefit of the manager/member.[14] *Id.* at 369. If there is a finding of actual fraud, then the veil may be pierced to hold the manager/member personally liable on the contractual debt or obligation. *Id.* As was the case in *Clem*, the veil-piercing exercise is not necessary if the manager/member is otherwise personally liable under an "other applicable statute." *Id.* (citing TEX. BUS. ORGS. CODE § 21.225(2)).[15]

Because it does not appear, nor has it been alleged, that Hunt violated an "other applicable statute," it is necessary to consider whether he perpetrated an actual fraud for his direct personal benefit while acting in his capacity as the sole manager of Tea 2 Go, LLC. *See Bale v. Ryan (In re Ryan)*, 443 B.R. 395, 406 (Bankr. N.D. Tex. 2010) ("The sham to perpetrate fraud doctrine prevents the use of the corporate entity as a cloak for fraud or illegality to work an

---

[14] TBOC § 21.223(a)(2) limits the imposition of personal liability as described above; however, TBOC § 21.223(b) states:

> Subsection (a)(2) does not prevent or limit the liability of a holder, beneficial owner, subscriber, or affiliate if the obligee demonstrates that the holder, beneficial owner, subscriber, or affiliate caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the holder, beneficial owner, subscriber, or affiliate.

TBOC § 101.002 makes TBOC § 21.223 applicable to limited liability companies. And TBOC § 101.114 provides that the general rule of limited liability may be modified by the company agreement.

[15] The "other applicable statute" in *Clem* was the Texas DTPA. *Clem*, 583 B.R. at 369–70.

injustice.").  The evolution of defining actual fraud in the context of piercing the corporate veil is well documented by the Fifth Circuit in *Spring Street Partners–IV, L.P. v. Lam*, 730 F.3d 427 (5th Cir. 2013).  Notably, actual fraud in this veil-piercing context is not equivalent to the tort of fraud.  *Husky Int'l Elecs., Inc. v. Ritz (In re Ritz)*, 832 F.3d 560, 567 (5th Cir. 2016) (citing *Latham v. Burgher*, 320 S.W.3d 602, 607 (Tex. App.—Dallas 2010, no pet.).  Rather, "actual fraud is defined as involving dishonesty of purpose or intent to deceive."  *Id.* (citing *Spring St.*, 730 F.3d at 442–43) (internal quotations omitted).  If the Court cannot conclude that Hunt's conduct amounted to actual fraud under Texas law, then there can be no debt to discharge, rendering moot the dischargeability issue under § 523(a)(2)(A).  *See id.* at 569.

Like *Harwood*, however, Trinkets and Tea's claim could still be excepted from discharge under § 523(a)(4) because Hunt stood in a fiduciary capacity in his relationship to the partnerships.  *See Harwood*, 404 B.R. at 397–98.  Despite the attempt to shield individual liability by creating a two-tier entity, Hunt exercised a substantial degree of control and direction over Tea 2 Go, LLC, the intermediary entity serving as one of the two general partners.[16]  When looking to "the nature of the business relationship as a whole," Hunt "exercised almost total control over the project."  *See id.* at 395 (quoting *Bennett*, 989 F.2d at 789).  Tea 2 Go, LLC would have "no life" without Hunt, and for that reason the Court determines that Hunt personally owed fiduciary duties to the partnership and partners.  *See id.* at 396 (quoting *Moorad*, 132 B.R. at 62–63).

---

[16] Trinkets and Tea is the other general partner.

**E.**

The Section 523(a)(2)(A) and (B) Causes

11. Section 523(a)(2)(A) excepts from discharge those debts for money, property, or services, or an extension, renewal, or refinancing of credit to the extent obtained by fraud or false pretenses. The provision does not, however, deal with false or fraudulent representations concerning the debtor's financial condition. § 523(a)(2)(A). The purpose of the provision is to prevent the debtor from retaining the benefits of property fraudulently obtained, and, for this reason, the debtor must have received the money (the singular focus of the dispute here) as a direct result of false representations or by actual fraud. *See RecoverEdge, L.P. v. Pentecost*, 44 F.3d 1284, 1292–93 (5th Cir. 1995).

False representations that could render a debt nondischargeable are those that are knowingly and fraudulently made and that materially concern the transaction at issue. *See Auto. Fin. Corp. v. Nunez (In re Nunez)*, No. 17-33845-hdh7, 2019 WL 1271450, at *2 (Bankr. N.D. Tex. Mar. 15, 2019). And the party to whom the representation is made must have justifiably relied on such statements to successfully argue that the resultant debt should be excepted from discharge. *See id.* A debtor's failure to fulfill a mere promise is not sufficient to render a debt nondischargeable. *See generally Goldberg Sec., Inc. v. Scarlata (In re Scarlata)*, 979 F.2d 521, 525 (7th Cir. 1992) (describing the possibility that the debtor's statement of future intention was true when made). On the other hand, a debtor's failure to fulfill contractual obligations could make the creditor's claim nondischargeable if the debtor had no intention of performing the obligations under the contract at the time it was entered. *See AT&T Universal Card Servs. v. Mercer (In re Mercer)*, 246 F.3d 391, 406–07 (5th Cir. 2001).

To prove a cause of action for actual fraud under § 523(a)(2)(A), the creditor must prove the following:

> (1) the debtor made a representation; (2) the debtor knew that the representation was false at the time it was made; (3) the debtor made the representation with the intent and purpose to deceive the creditor; (4) the creditor relied on the representation; and (5) the creditor sustained a loss as the proximate result of its reliance on the representation.

*Nunez*, 2019 WL 1271450, at *3 (citing *Selenberg v. Bates (In re Selenberg)*, 856 F.3d 393, 398 (5th Cir. 2017)). An allegation of actual fraud requires scienter, and the underlying conduct involves "moral turpitude or intentional wrong." *See Pentecost*, 44 F.3d at 1292. Thus, debts arising from constructively fraudulent conduct are dischargeable under § 523(a)(2)(A). *Id*.

12. Section 523(a)(2)(B) provides that a debt is nondischargeable if it was obtained by use of a written statement that is materially false, that respects the debtor's or an insider's financial condition, that the debtor caused to be made or published with intent to deceive, and upon which the creditor reasonably relied. The first element, a written statement, is evident on its face and not at issue here. The financial disclosure documents provided by Hunt to potential investors is a written statement. And the partnership agreements presented and signed by the parties are also written statements.

For the second element—material falsity—the Court notes, as it did previously,

> A materially false statement is one that "paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally affect the decision to grant credit." Further, in determining whether a false statement is material, a relevant although not dispositive inquiry is "whether the lender would have made the loan had he known the debtor's true situation." Finally, it is well-established that writings with pertinent omissions may qualify as "materially false" for purposes of § 523(a)(2)(B).

*Lubbock Nat'l Bank v. Wallace (In re Wallace)*, No. 12-50435-RLJ-7, 2013 WL 5442074, at *4 (Bankr. N.D. Tex. Sept. 27, 2013) (quoting *Jordan v. Se. Nat'l Bank (In re Jordan)*, 927 F.2d

221, 224 (5th Cir. 1991), *overruled on other grounds by In re Coston*, 991 F.2d 257, 259 (5th

Cir. 1993)).

Importantly, § 523(a)(2)(B) does not cover every material statement of fact made in

writing to a creditor to obtain money. The statement must concern the *debtor's* financial

condition. § 523(a)(2)(B)(ii). In *American Bank of Commerce v. Powell (In re Powell)*, 423

B.R. 201, 210–11 (Bankr. N.D. Tex. 2010), the court discussed the meaning of "statement

respecting . . . financial condition" and noted that there are two competing definitions. Writing

first of those cases that adopt a limited definition, the court observed that "the phrase 'statement

respecting the debtor's . . . financial condition' as used in section 523(a)(2)(B) means traditional,

formal financial statements such as balance sheets, profit/loss statements, and statements of net

worth." *Id.* at 210 (internal citations omitted). Conversely, a more liberal construction suggests

that the phrase "encompass[es] a much broader class of statements, even those which relate to a

single asset or liability." *Id.* at 210–11 (internal citations omitted). Ultimately, the *Powell* court,

noting first that the liberal definition was the "emerging majority," adopted the liberal

construction to decide that the writings at issue in that case were statements respecting the

debtor's financial condition. *Id.*

The debtor must also intend to deceive the creditor at the time such written statements

concerning the debtor's financial condition are furnished for the purpose of obtaining money.

§ 523(a)(2)(B)(iv). The Court is permitted to weigh the totality of the circumstances to

determine if the debtor submitted false financial statements that were either knowingly false or

"made so recklessly as to warrant a finding that the debtor acted fraudulently." 4 *Collier on

Bankruptcy* ¶ 523.08[2][e][ii] (Richard Levin & Henry J. Sommer eds., 16th ed.). An assertion

of honest intent should be weighed against the natural inferences available from the admitted facts. *See id.*

Finally, there must be a finding that the creditor reasonably relied on the false written statement. § 523(a)(2)(B)(iii). Again, the inquiry is made considering the totality of the circumstances and the available facts presented at trial. *See In re Coston*, 991 F.2d at 261.

> The bankruptcy court may consider, among other things: whether there had been previous business dealings with the debtor that gave rise to a relationship of trust; whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and whether even minimal investigation would have revealed the inaccuracy of the debtor's representations.

*Id*. Such considerations are unique to each case, and no court has articulated a system of weighing one factor more heavily than another.

13. Trinkets and Tea's "claim" is based on the investment that Heise made for Trinkets and Tea. For the $90,000, Trinkets and Tea obtained an interest in the two partnerships, albeit not a controlling interest in either. The typical dischargeability claim is made by a creditor or lender rather than an investor. An investor looks to share in the profits of the enterprise; a creditor simply expects to be paid what is owed. In the bankruptcy context, creditors stand ahead of investors. Investors assume greater risk than do creditors. A lender looks to specific items that will indicate whether a borrower can repay a loan. The Court includes this distinction between investors and creditors within the totality of circumstances considered here.

14. Prior to Heise's investment, Hunt told Heise that the Tea 2 Go stores, including the Glenna store and his tanning salon business, were profitable. According to Heise, Hunt told him that the Glenna store made $3,000–$10,000 per month. He said the Hub store, based on location and added conveniences, would potentially be a more profitable store than the Glenna store.

15. Hunt provided Heise with some written information—a one-page statement of income and expenses for the Glenna store, a franchise information packet that disclosed the franchise fee and included a three-month snapshot of profits and losses for "one of our stores." Pl.'s Ex. 14. He also provided Heise with P&L statements for the Glenna store that covered April 2014 through October 2014. Pl.'s Ex. 15. These reflected that revenues exceeded expenses for each of the referenced months. The Court infers that the rental expense reflected on the Glenna store's P&Ls may have been understated by as much as $2,000 per month. (The store would have still reflected a profit for each month if the rentals were increased by such amount.)

16. Apart from possibly the Glenna store's monthly rental payments, the evidence does not prove that Hunt's representations were false. And the Court cannot conclude that Hunt's representations were *materially* false.

17. The evidence does not prove that Hunt made a promise concerning the profitability of the stores.

18. There is no evidence that, prior and up to the time Heise made the investment, Hunt intended to cheat or deceive Heise.

19. By the partnership agreements, Hunt, as the manager of each partnership, was responsible for keeping "complete and accurate records of Partnership transactions." Pl.'s Exs. 1, 2. Heise contends that Hunt's failure to open a separate account for each partnership violates this obligation. But Heise's after-the-fact view of this is insufficient to raise a dischargeability element. As found, revenues went into the Tea 2 Go account, and Hunt paid non-partnership items out of each account. But the evidence does not indicate whether the partnerships were the sole source of funds deposited into the account. This obligation from both agreements is simply

too vague and general to create an inference of an intentional breach by any particular act by Hunt.

20. Heise testified that he and Hunt "talked about" having a joint bank account for the two partnerships. And though each partnership agreement states that the partnership shall keep complete and accurate records of the partnership transactions, neither specifies how this was to be done. They do not state that a separate bank account would be opened-up for each store. That deposits were made to an account of the controlling general partner for both partnerships appears to coincide with Heise's expectation at the time he made his investment. At most, the partnership agreements grant authority to the partners to acquire and hold partnership property, to open accounts, and to collect sums due the partnership. The Court cannot conclude that maintaining an account with the general partner of both partnerships was deliberately misleading or improper.

21. Trinkets and Tea complains that books and records were not kept but offered no evidence of precisely what records needed to be kept.

22. Importantly, Heise, for himself and for Trinkets and Tea, failed to prove how Hunt's failure to keep separate books and records would have affected his decision to invest with Hunt. What specific information was he wanting? He did not make a loan; he made an investment. An investment connotes the assumption of risk.

23. For the § 523(a)(2)(A) and (B) causes of action, the evidence fails to prove that the various representations made by Hunt prior to Heise's investment—both oral and written, Findings 3–6, 8—were materially false. And the evidence does not prove that Hunt's other stores and business ventures, at such time, were financially troubled. Hunt thus did not fail to disclose a material fact on which a dischargeability claim can be based.

24. The evidence is insufficient to establish that Hunt knowingly and fraudulently made a materially false representation to Heise prior to his investment.

25. The information contained within the written documentation provided by Hunt did not constitute a series of promises by Hunt.  Heise's asserted reliance on such information was neither reasonable nor justifiable.  The Court gives little weight to Heise's after-the-fact assertions that he would not have made the investment but for Hunt's promotional pitches.

26. The misstated rent of the Glenna store was not material nor, in context, fraudulent; and it did not concern Hunt's or the Glenna store's financial condition for purposes of § 523(a)(2)(A) and (B).

27. Heise was a naïve investor and should not have gone forward with Hunt.  Hunt was indifferent to Heise and Heise's stake in the two stores.  From the evidence, the Court cannot conclude that Hunt adequately managed the two stores or properly accounted for their respective finances.  But given the relationship of the parties, the Court cannot conclude that Hunt's conduct, both before and after Heise's investment, implicates a nondischargeable claim under § 523(a)(2) of the Bankruptcy Code.

28. Heise's "understanding" of Hunt's supposed expertise and experience in operating a small retail store, coupled with his own naivete, does not make his investment non-dischargeable.

## F.

### The Section 523(a)(4) and (a)(6) Causes

29. Section 523(a)(4) excepts from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."  Fraud, in this context, generally includes intentional deceit as opposed to implied or constructive fraud.  *See Lester v. Dean (In re Dean)*,

No. 16-43088-mxm-7, 2018 WL 4810700, at *22 (Bankr. N.D. Tex. Sept. 29, 2018). Because

Hunt lawfully came into possession of Trinkets and Tea's property (money), embezzlement,

rather than larceny, is the appropriate cause despite the allegations contained in the complaint.

*See Miller v. J.D. Abrams Inc. (In re Miller)*, 156 F.3d 598, 602 (5th Cir. 1998); *In re Kakal*, 596

B.R. 335, 342 (Bankr. S.D. Tex. 2019) ("Both larceny and embezzlement involve the fraudulent

appropriation of property; they differ only in timing. Larceny applies when a debtor unlawfully

appropriates property at the outset, whereas embezzlement applies when a debtor unlawfully

appropriates after it has been entrusted to the debtor's care.") (internal citation omitted).

"Embezzlement is defined for purposes of § 523(a)(4) as the fraudulent appropriation of property

by a person to whom such property has been entrusted, or into whose hands it has lawfully

come." *Miller*, 156 F.3d at 602 (internal quotation omitted). To except a debt from discharge

for embezzlement, the objecting creditor must prove the debtor's fraudulent intent in taking the

property. *Id.* at 602–03.

      "[A] defalcation is a willful neglect of duty." *Harwood*, 404 B.R. at 393. It "requires a

culpable state of mind involving knowledge of, or gross recklessness with respect to, the

improper nature of the fiduciary behavior." *Dean*, 2018 WL 4810700, at *22 (citing *Bullock v.

BankChampaign, N.A.*, 569 U.S. 267, 269 (2013)). Mental culpability related to a defalcation is

evaluated objectively and "charges the debtor with knowledge of the law without regard to an

analysis of his actual intent or motive and, accordingly, the fiduciary is presumed to know his

legal obligations." *Harwood*, 404 B.R. at 393 (internal quotation and citation omitted). The

relevant question, then, is "what a reasonable person in the debtor's position knew or reasonably

should have known" regarding the debtor's duty owed as a fiduciary. *Id.* A mere negligent

breach of fiduciary duty is not enough to constitute a defalcation under § 523(a)(4), rather the debtor must willfully abandon their duties as a fiduciary. *See id.* at 393, 398–99.

"[I]n the bankruptcy context, the burden is on the creditor to establish that an affirmative defense is inapplicable—rather than on the debtor to establish that one is applicable—because the creditor has the ultimate burden of proving that a debt falls within the scope of" § 523(a)(4). *Ratliff Ready-Mix, L.P. v. Pledger (In re Pledger)*, 592 F. App'x 296, 302 n.2 (5th Cir. 2015). Such allocation of the burden of proof complies with "the principle that the Code should be strictly construed against the objecting creditor and in favor of the debtor." 4 *Collier on Bankruptcy* ¶ 523.10[1][c]; *see also Cowin v. Countrywide Home Loans, Inc. (In re Cowin)*, 864 F.3d 344, 349 (5th Cir. 2017) (stating that "exceptions to discharge must be strictly construed against a creditor and liberally construed in favor of a debtor so that the debtor may be afforded a fresh start." (internal citation omitted)).

30. Section 523(a)(6) states that a "discharge under section 727 . . . of this title does not discharge an individual debtor from any debt for willful and malicious injury by the debtor to another entity or to the property of another entity." In considering those injuries that are "willful" and "malicious," the Supreme Court wrote, "The word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998) (emphasis in original); *see also Miller*, 156 F.3d at 606 ("[W]e hold that an injury is 'willful and malicious' where there is either an objective substantial certainty of harm or a subjective motive to cause harm."). A debt is thus nondischargeable if there is a finding that the injury was both willful *and* malicious. *See Miller*, 156 F.3d at 604–05.

31. Heise's (and Trinkets and Tea's) *claim* is based, in effect, on his having been induced into making the investment by Hunt's wrongful conduct and representations. For the § 523(a)(4) and (a)(6) causes, the evidence fails to establish the requisite "debt" that derives from the acts covered by (a)(4) and (a)(6). There is some evidence that Hunt wrongfully used partnership funds for non-partnership purposes. But the evidence fails to prove *the debt* that arose from such conduct. The evidence is unclear on this point. It does not address whether funds from sources other than the two partnerships were deposited into the Tea 2 Go account. Hunt failed to address this issue, as well, which can raise an inference that no other funds funded the account. He simply testified that it never occurred to him to open-up separate accounts for the partnerships. On balance, however, the Court cannot conclude that Hunt committed fraud while acting in a fiduciary capacity, embezzlement, or larceny. The evidence is insufficient to prove intentional deceit on Hunt's part.

32. And even assuming that Hunt had a fiduciary obligation to Heise (and Trinkets and Tea), the debt arising from his alleged failure to honor such obligation is unproven. The debt here is based on Heise's investment that turned out bad and is, at most, indirectly related to Hunt's alleged wrongful conduct after the investment and formation of the partnerships.

33. The facts fail to establish the elements of embezzlement or larceny. Hunt's handling of the funds was arguably contrary to the terms of the partnership agreements. But the evidence falls well short of proving that he embezzled funds from the partnership. Heise's $90,000 investment was made voluntarily and thus cannot satisfy an element of larceny. The evidence does not explain how the $90,000 was used by Hunt or the two partnerships

34. The evidence does not prove that Hunt wrongfully obtained partnership funds with the intent to convert such funds to his own use.

35. The evidence wholly fails to establish a claim under § 523(a)(6). Hunt did not intend to injure Heise or Trinkets and Tea. His conduct cannot be characterized as willful and malicious. There is no evidence of Hunt's personal animus, dislike, or recklessness towards Heise (and Trinkets and Tea) that is sufficient to create an (a)(6) claim. Heise and Trinkets and Tea failed to prove any aggravating circumstances from which the Court can infer a viable claim under § 523(a)(6).

36. The evidence does not prove that Hunt intended to harm Heise or Trinkets and Tea.

### G.

### The Section 727(a)(3) and (a)(4)(A) Causes

37. Section 727(a)(3) states

> The court shall grant the debtor a discharge, unless—the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

The Court may deny the discharge if "(1) the debtor fails to keep or preserve financial records, and (2) the failure makes it impossible for the creditor to discern the debtor's financial condition." *Buescher v. First United Bank & Tr. (In re Buescher)*, 783 F.3d 302, 307 (5th Cir. 2015). The creditor bears the initial burden of proof on both elements, and, then, the burden shifts to the debtor "to show that the failure to keep records was justified under the circumstances." *Id.* at 308.

The debtor's financial records need not contain full details of all transactions, but the debtor must be able to present an accurate representation of its financial condition. *See Lakeland W. Capital XXIII, LLC v. Black (In re Black)*, No. 17-32430-hdh7, 2018 WL 6719713, at *9 (Bankr. N.D. Tex. Dec. 18, 2018). "The adequacy of the debtor's records is determined on a

case by case basis, using such considerations as the debtor's occupation, financial structure, education, experience, sophistication and any other circumstances that should be considered in the interest of justice." *Cadle Co. v. Duncan (In re Duncan)*, 562 F.3d 688, 697 (5th Cir. 2009) (internal quotation and citation omitted). Where there is a complete failure to distinguish between personal and business expenses of an individual debtor, making it impossible to determine the debtor's true financial condition, there exists grounds to deny the discharge under § 727(a)(3). *See Neary v. Moody (In re Moody)*, No. 18-30130-SGJ-7, 2018 WL 6653015, at *3 (Bankr. N.D. Tex. Dec. 17, 2018) (denying the debtor's discharge under § 727(a)(3) because the debtor's former employer "paid most, if not all," of the debtor's personal expenses both directly and indirectly and the debtor could not present records of the debtor's true financial condition). Ultimately, the Court has "wide discretion" to analyze the shifting burdens of proof between the creditor and debtor and to determine the adequacy of the information disclosed by the debtor. *See Duncan*, 562 F.3d at 697.

38. Section 727(a)(4)(A) denies debtors a discharge if they "knowingly and fraudulently, in or in connection with the case . . . made a false oath or account." In this circuit,

> [t]o prevail on a claim under this subsection, an objecting plaintiff (a creditor or the trustee) must prove by a preponderance of the evidence "that (1) the debtor made a . . . statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement was material to the bankruptcy case."

*Judgment Factors, L.L.C. v. Packer (In re Packer)*, 816 F.3d 87, 94 (5th Cir. 2016) (quoting *Duncan*, 562 F.3d at 695). The omission of an asset can qualify as a false oath. *Cadle Co. v. Pratt (In re Pratt)*, 411 F.3d 561, 566 (5th Cir. 2005). On its own, however, omissions or mistakes are not enough to demonstrate fraudulent intent. *Neary v. Harding (In re Harding)*, No. 14-03078-hdh7, 2015 WL 222482, at *5 (Bankr. N.D. Tex. Jan. 14, 2015) ("[M]istakes by

themselves do not equal fraudulent intent meriting denial of discharge."); *Cadle Co. v. Preston-Guenther (In re Guenther)*, 333 B.R. 759, 767–68 (Bankr. N.D. Tex. 2005) (stating that it "may be close to impossible to produce Schedules and [Statements of Financial Affairs] that contain no mistaken information, and bankruptcy papers with mistakes are not, alone, enough to bar a debtor's discharge"). Fraudulent intent requires the cumulative effect of false statements, taken with sufficient circumstantial evidence, to evidence an actual intent to deceive or a reckless disregard for the truth. *Sholdra v. Chilmark Fin. LLP (In re Sholdra)*, 249 F.3d 380, 383 (5th Cir. 2001). Here, the burden is on Trinkets and Tea to prove such intent by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 289 (1991); *see also Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 178 (5th Cir. 1992).

39. The evidence is insufficient to warrant denial of Hunt's discharge. The cause under § 727(a)(3) requires proof that Hunt failed to keep or preserve adequate records of his financial condition or business transactions. The evidence here addresses Hunt's failure to maintain records of the Glenna and Hub partnerships. And this contention stems from his failing to keep a separate checking account for each partnership. While Hunt's failure to keep a separate account for each partnership muddies the analysis of each partnership's financial condition, it does not necessarily impair a review of *Hunt's* financial condition. Hunt disclosed his interest in the LLCs and thus his indirect interest in the partnerships. Trinkets and Tea does not allege that it cannot determine Hunt's personal financial condition or the cause of *his* financial demise. Whether Hunt, as owner of the controlling general partner and manager of both partnerships, kept adequate records of each of the partnerships is a different question that is, at most, indirectly related to Hunt's personal finances. And, frankly, it is too remote to warrant denial of discharge.

40. Trinkets and Tea's discharge cause under § 727(a)(4)(A) suffers a similar fate.  Its main charge is that Hunt made a false oath in his failing to disclose in his bankruptcy schedules his interest in the domain name "nobilitea.us" and that he did not correct this failure until after this suit was brought.  Hunt is presently employed by tea company Nobilitea and testified that he hoped to someday gain an ownership interest in the company.  But there is no evidence that the domain name has or ever will have any value.  It is merely an intangible "asset."  Hunt's failure to initially disclose an immaterial item cannot justify denial of the discharge.

### End of Memorandum Opinion ###